Filed 10/28/14  Opinion following rehearing

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,** | |
| **Plaintiff and Respondent,** | **A134124** |
| **v.** | |
| **DEMETRIS COLEMAN,** | **(Contra Costa County** |
| **Defendant and Appellant.** | **Super. Ct. No. 05-110237-5)** |

The People charged appellant Demetrius Coleman with possession of cocaine base for sale (Health & Saf. Code, § 11351.5).  Before the preliminary hearing, Coleman moved — pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) — for discovery of material in the personnel file of Richmond Police Officer Matthew Stonebreaker, the arresting officer.  Coleman also requested the City of Richmond Police Department (Police Department) "run a 'rap sheet'" — a colloquialism for record of arrests and prosecution — on Officer Stonebreaker.  The court partially granted the motion.  It conducted an in camera hearing pursuant to *Pitchess*, reviewed Officer Stonebreaker's personnel file, and ordered the City of Richmond (City) to disclose information concerning a "complaint of false identifying information."  The court, however, denied the motion to the extent it sought Officer Stonebreaker's birth date or rap sheet.  The court also denied Coleman's motion for reconsideration.

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., III., and IV.

Coleman moved to suppress at the preliminary hearing. The magistrate denied the motion. The trial court denied Coleman's motion to set aside the information and his renewed suppression motion (Pen. Code, §§ 995, 1538.5, subd. (i)).[1] Before trial, Coleman moved for an order pursuant to *Brady* and section 1054.1 requiring the prosecution to, among other things, run rap sheets on all testifying prosecution witnesses. The court granted the motion in part and denied it in part, explaining it would order the People to comply with *Brady* but would "not order rap sheets to be run on the officers." A jury convicted Coleman of possession of cocaine base for sale (Health & Saf. Code, § 11351.5) and the court sentenced him to county jail. The court also ordered Coleman to pay a $570 drug program fee (Health & Saf. Code, § 11372.7, subd. (a)), and $500 in attorney fees (§ 987.8, subd. (b)).

On appeal, Coleman contends the court erred by: (1) denying his motion to suppress; (2) declining to order the prosecution to run Officer Stonebreaker's rap sheet; (3) delegating to the probation department the determination of his ability to pay the drug program fee pursuant to Health and Safety Code section 11372.7; and (4) ordering him to pay attorney fees pursuant to section 987.8 without determining his ability to pay.

We affirm in part and reverse in part. We affirm the court's denial of Coleman's motion to suppress and the court's denial of his motions for an order requiring the prosecution to run Officer Stonebreaker's rap sheet. We reverse the order imposing the Health and Safety Code section 11372.7 drug program fee and the section 987.8 attorney fees. On remand, the trial court must determine Coleman's ability to pay both the drug program fee and attorney fees.

FACTUAL AND PROCEDURAL BACKGROUND

The prosecution charged Coleman with possession of cocaine base for sale (Health & Saf. Code, § 11351.5). Before the preliminary hearing, Coleman filed a hybrid *Brady/Pitchess* motion for discovery of material in Officer Stonebreaker's personnel file "indicating . . . internal and civilian complaints, investigations, or reports in which

---

[1]     Unless noted, all statutory references are to the Penal Code.

2

allegations of corruption, illegal arrests and/or searches, the fabrication of charges and/or evidence, acts of harassment or malicious conduct against citizens, dishonesty and improper tactics . . . or false arrest[.]" The motion also requested the Police Department produce "Officer Stonebreaker's relevant criminal history, including any arrests or convictions involving crimes of moral turpitude . . . whether that information is contained in personnel files or not." In addition, Coleman requested the Police Department "run a 'rap sheet' on Officer Stonebreaker[.]"

Regarding *Brady*, Coleman contended he was entitled to Officer Stonebreaker's criminal history, if any, because the information would impeach Officer Stonebreaker, a testifying prosecution witness. Coleman claimed he needed the information "to competently defend [himself] in the underlying criminal prosecution and to cross-examine prosecution witnesses at trial." Regarding *Pitchess*, Coleman argued there was good cause for disclosure of Officer Stonebreaker's criminal history because Officer Stonebreaker made material misstatements in his police report. According to Coleman, Officer Stonebreaker's truthfulness was "material to the issue in this case because his past misconduct would rebut any reasonable suspicion that Mr. Coleman was ever in possession of the narcotics."

Defense counsel's supporting declaration averred Coleman did not possess narcotics on the day of the incident and did not "toss[ ] a bag of cocaine from his person." Counsel stated the City, the Police Department, and/or the Contra Costa County District Attorney's Office possessed the materials and there was good cause to produce them because Officer Stonebreaker had a "tendency to fabricate incident reports and initiate detentions without reasonable suspicion." In addition, defense counsel stated information about Officer Stonebreaker's criminal history was relevant to impeach him at a motion to suppress hearing, preliminary examination, or trial. Finally, defense counsel's declaration attached Officer Stonebreaker's police report, where he stated he saw Coleman toss a bag of narcotics behind him, and Officer Danielle Evans's police report, where she stated: "While standing next to Coleman I did not observe him discard the suspected narcotics."

3

The City and Police Department opposed the motion, arguing Coleman had not demonstrated the confidential information was material to the issues at the preliminary hearing, in part because defense counsel's supporting declaration did not allege "facts from which it is reasonable to conclude [ ] Officer [Stonebreaker] may have a criminal history or, if he does, that anything contained in that history may be relevant to the pending litigation." The City also stated it did not possess "summary criminal history" for Officer Stonebreaker and was not required to search for such information. As the City explained, "In compliance with California Department of Justice directives regarding access to the Automated Criminal History System, the City does not search for criminal history except on a 'need to know' basis and in accordance with state law. Under . . . Sections 11105(b) and 13300(3)(b), the City may provide a summary criminal history to the court only after the court has determined that the information is needed in the course of its duties."

At a hearing, counsel for the City and the Police Department argued the *Pitchess* motion lacked "allegations supporting a search for a criminal history. . . . We have [no] information that leads us to believe there might be a criminal history" for Officer Stonebreaker and explained, "What is in the personnel file prior to employment, there is a check, a pre-employment check, and that would be in the personnel file, if there were any disqualifying offenses. That's what already exists in there. [¶] In order to have permission to get more, there needs to be some sort of showing of necessity and . . . the DOJ wouldn't allow us to just run Live Scans; we cannot do that."

At the conclusion of the hearing, the court agreed to examine Officer Stonebreaker's personnel file for "dishonesty in terms of falsifying information" but explained, "It seems that the purpose of *Pitchess* is being stretched beyond its original intent. . . . [¶] I'm not going to order a [ ] rap sheet run on the officer. I believe that's something that's reserved for trial. . . . [¶] I'm also going to decline to give the date of birth of the officer. Should this case go forward — we've not even had a holding order to see if it's adequate to go to trial. [¶] Should it go forward, you can pursue that in the trial court." The court then conducted an in camera hearing pursuant to *Pitchess* and ordered

4

the City to disclose information concerning a "complaint of false identifying information."

Coleman moved for reconsideration, arguing he was entitled to *Pitchess* discovery — including Officer Stonebreaker's criminal history — before the preliminary hearing. In the alternative, Coleman urged the court to order the City to disclose Officer Stonebreaker's birth date to the prosecution so the prosecution could run the rap sheet. The City and the Department opposed the motion and Coleman's request to order the City to disclose Officer Stonebreaker's birth date. They argued Coleman's original motion lacked allegations "supporting a reasonable belief that [ ] Officer [Stonebreaker] may have a criminal record. . . . [¶] The Court conducted *in camera* review of the Officer's confidential records maintained by the [Police] Department and ordered disclosure of all relevant information in accordance with *Pitchess* procedure. Absent evidence that [ ] Officer [Stonebreaker] has a criminal history and that the criminal history may be relevant to Defendant's case, the Court has no grounds upon which to order the City to obtain a criminal history and the City has no right to request a criminal history on an Officer without an order demonstrating that there is a need to know."

Following a hearing, the court denied the reconsideration motion, concluding the "original *Pitchess* motion did not have a sufficient basis of materiality or evidence for the court to consider . . . releasing the date of birth or rap sheet." The court continued, "I don't believe there's any legal authority to provide a rap sheet . . . particularly without any showing whatsoever that a rap sheet would be relevant to this, as well as the date of birth is not relevant to the *Pitchess* motion." As the court explained, "I granted the in camera review on the *Pitchess* motion based on the other aspects of the motion, to look for any evidence of the type of misconduct that was relevant and for which there was a material showing, but there was no sufficient showing for the release of the date of birth, which is personal and private, or the rap sheet. [¶] I agree the City can't do it [obtain Officer Stonebreaker's rap sheet, if any] without a court order, and therefore, I am not going to change my original decision. The *Pitchess* motion as to the date of birth and/or running of a rap sheet is denied."

Coleman did not move to dismiss contending the prosecution violated its *Brady* obligation to disclose exculpatory information (see *People v. Gutierrez* (2013) 214 Cal.App.4th 343, 349 (*Gutierrez*)) nor did he seek writ relief from the order denying his request for Officer Stonebreaker's rap sheet (*Hill v. Superior Court* (1974) 10 Cal.3d 812 (*Hill*)).

*Motion to Suppress, Renewed Suppression Motion, and Motion in Limine*

Before the preliminary hearing, Coleman moved to suppress. At the combined motion to suppress and preliminary hearing, the parties presented the following evidence:

Richmond Police Officers Stonebreaker and Evans were in uniform on bicycle patrol in a residential area known for narcotics activity when they saw Coleman walking alone.[2] They rode up to Coleman, got off their bicycles, and stood about five feet away from him. They said, "[W]hat's up?" Officer Stonebreaker asked Coleman for his name and date of birth and Coleman responded. At that point, Officer Evans performed a records check. As she did so, Officer Stonebreaker asked Coleman whether he was on probation or parole, and whether he had "anything illegal on him[.]" The officers told Coleman they were part of the bicycle patrol program and were "meeting residents in the area. [Coleman] stopped to talk" to the officers "to see what it was." The officers issued no commands nor gave Coleman any directions.

While the officers spoke to Coleman — and about three minutes after they approached him — they learned he had an outstanding warrant. Officer Stonebreaker handcuffed Coleman and the officers waited "for a transport vehicle." Coleman's back was against a rod iron fence. Officer Stonebreaker stood in front of Coleman, on his left side. Officer Evans stood on Coleman's other side, facing Officer Stonebreaker. Together, the officers and Coleman formed a triangular position. While they waited, Mr. Coleman "adjusted his pants a couple of times and while doing so he retrieved a clear

---

**2**     Carlos English testified for Coleman. English, who is homeless and collects cans in a shopping cart, described Officer Stonebreaker a "[n]ightmare" and claimed he turned over English's shopping cart and took cans out of it, and "harass[ed] [English] for nothing." Officer Stonebreaker did not remember overturning English's shopping cart or taking recyclables from it.

plastic baggy containing an off-white chunky substance" Officer Stonebreaker suspected was cocaine. Coleman "kind of moved his hands . . . back and forth. He did it a couple of times. As he's doing so, he's kind of smiling and laughing." Coleman tossed the object and it landed about two or three feet behind him, behind the fence. Officer Evans saw Coleman adjusting his clothes, but did not see him discard any narcotics.

A patrol car arrived. As Officer Evans escorted Coleman to the car, Officer Stonebreaker retrieved the object: a clear plastic baggie 18 individually packaged pieces and another baggy containing "a couple of large chunks" — or about 6.29 grams — of cocaine base. At that point, Coleman "became very angry" and "very combative, trying to hit the door with his shoulder, very verbally abusive, and saying whatever we found is not his." When the officers searched Coleman, they found $193 in small bills.

At the conclusion of the preliminary hearing, the court denied Coleman's motion to suppress, concluding the encounter was consensual, and held Coleman to answer the charge. Coleman filed a motion to set aside the information (§ 995) and a renewed suppression motion (§ 1538.5, subd. (i)). The trial court denied the motions. It determined the officers "did not issue any commands; they did not block [Coleman's] path; they did not display any weapons. The evidence did not reflect a physical touching of [Coleman's] person or a tone of voice indicating that it was mandatory for [Coleman] to answer Officer Stonebreaker's questions. [¶] The encounter occurred in daylight at a seemingly busy location. The public nature of the encounter is arguably increased because the officers were on bicycles — no patrol cars to shield from public view whatever was going on." Finally, the court concluded the warrant check did not transform the encounter into a detention.

Later, Coleman moved in limine for an order — pursuant to *Brady* and section 1054.1 — requiring the prosecution to, among other things, run rap sheets on all prosecution witnesses, "including any police witnesses, if they have not done so already." At a hearing, the court explained Coleman was requesting the "prosecution run rap sheets on all prosecution witnesses including any police witnesses if they've not already done so. Essentially, the *Brady* obligation." When the court asked the prosecutor whether he

7

objected, the prosecutor responded, "[n]o objection" and noted he had disclosed Officer Stonebreaker and Evans's police reports and a "supplemental police report which was discovered." Then the court stated, "I will then grant [the motion in limine]. The People have complied with their *Brady* requirements."

At that point, defense counsel clarified she "requested specifically that rap sheets be run on all prosecution's witnesses, including officers." The court explained it was granting the motion in limine "except that I will not order rap sheets be run on the officers. However, I will require the People to comply with *Brady*. Somewhat of a distinction." In response, the prosecution stated, "Yes, Your Honor." Defense counsel objected, arguing: "I think that the prosecution should be required to run rap sheets on their police witnesses. There's no reason to exempt them. And it's my understanding that the prosecution does run rap sheets on all of their other witnesses as well as defense witnesses and sometimes even jurors." The court noted the objection and overruled it.

*Verdict and Sentencing*

The jury convicted Coleman of possession of cocaine base for sale (Health & Saf. Code, § 11351.5). The court sentenced Coleman to three years in jail. Among other things, the court ordered Coleman to pay a $570 drug program fee (Health & Saf. Code, § 11372.7, subd. (a)) and $500 in attorney fees (§ 987.8, subd. (b)). At the sentencing hearing, the court stated: "[Coleman is] to pay a court security fee of $40, a court conviction assessment of $30, a probation report fee of $176, a criminal justice administration fee of . . . $564. [¶] A lab analysis fee . . . of $190 and a drug program fee of $570. [¶] All of these other fines and fees, except for the $600 restitution fee, are based on his ability to pay. So probation will do an analysis of his ability to pay, and it will be set that way. [¶] Attorney's fees will be assessed in the amount of $500." Defense counsel did not object to the imposition of these fees.

The probation report did not recommend the imposition of the drug program fee or attorney fees, nor did it address Coleman's ability to pay such fees. The report, however, described Coleman's education and employment history. Coleman — who was 39 years old at the sentencing hearing — earned his General Education Diploma (G.E.D.) and took

8

several classes toward earning an administrative justice certificate. He dropped out of the program after losing his driver license. Coleman suffers from numerous health problems and reported being diagnosed with schizophrenia. The probation report described Coleman as "employable" and noted he has "electrical skills. He was employed by the Chevron Refinery in Richmond performing fire watch duties from 1993 to 1997. . . . He was employed by Veraflow in Richmond, which manufactures parts for the Chevron Refinery. Additionally he possesses skills in painting and landscaping." Before Coleman was incarcerated, he was the primary caregiver for his ailing sister. Coleman "reported that he does not have a checking or saving account. He advised that he has no assets."

We filed our decision. After receiving a request to publish the opinion, we granted rehearing on our own motion to reconsider our decision. (Cal. Rules of Court, rule 8.268(a)(1).)

## DISCUSSION

### I.

### *The Court Properly Denied Coleman's Motion to Suppress*

Coleman contends the trial court erred by denying his renewed suppression motion (§§ 995, 1538.5, subd. (i)). "A criminal defendant is permitted to challenge the reasonableness of a search or seizure by making a motion to suppress at the preliminary hearing. [Citation.] If the defendant is unsuccessful at the preliminary hearing, he or she may raise the search and seizure matter before the superior court under the standards governing a section 995 motion. [Citation.] . . . [¶] In a proceeding under section 995, the superior court's role is similar to that of an appellate court reviewing the sufficiency of the evidence to sustain a judgment. [Citations.] The superior court merely reviews the evidence; it does not substitute its judgment on the weight of the evidence nor does it resolve factual conflicts. [Citation.] On appeal from a section 995 review of the denial of a defendant's motion to suppress, we review the determination of the magistrate at the preliminary hearing. [Citations.] We must draw all presumptions in favor of the magistrate's factual determinations, and we must uphold the magistrate's express or

9

implied findings if they are supported by substantial evidence.  [Citations.]"  (*People v. McDonald* (2006) 137 Cal.App.4th 521, 528-529 (*McDonald*).)

To determine "whether the challenged search or seizure was reasonable under the Fourth Amendment, we review the magistrate's factual determinations under the substantial evidence standard.  [Citation.]  We judge the legality of the search by 'measur[ing] the facts, as found by the trier, against the constitutional standard of reasonableness.'  [Citation.]  Thus, in determining whether the search or seizure was reasonable on the facts found by the magistrate, we exercise our independent judgment.  [Citation.]"  (*McDonald, supra,* 137 Cal.App.4th at p. 529.)

Police contacts with individuals fall into three broad categories: (1) consensual encounters; (2) detentions; and (3) formal arrests.  (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*); *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784 (*Wilson*).)  The Fourth Amendment does not protect every encounter between the police and a citizen.  (*In re Christopher B.* (1990) 219 Cal.App.3d 455, 460.)  As the United States Supreme Court has explained, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."  (*Florida v. Royer* (1983) 460 U.S. 491, 497; *Wilson*, *supra*, 34 Cal.3d at p. 789; *Florida v. Bostick* (1991) 501 U.S. 429, 434 (*Bostick*) [a detention does not occur when a police officer approaches a person on the street and "asks a few questions"].)

"[N]o reasonable suspicion is required on the part of the officer" before initiating a consensual encounter.  (*Manuel G., supra,* 16 Cal.4th at p. 821; *People v. Hughes* (2002) 27 Cal.4th 287, 327.)  To determine whether an encounter is consensual, a court considers "all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  (*Bostick, supra,* 501 U.S. at p. 439; *Michigan v. Chesternut* (1988) 486 U.S. 567, 573, disapproved

10

on another point as stated in *People v. Walker* (1991) 54 Cal.3d 1013, 1022.)  Put another way, an encounter is consensual if, after considering the totality of the circumstances, "a reasonable person would feel free to disregard the police and go about his or her business. . . ." (*Manuel G., supra,* 16 Cal.4th at p. 821.)  "What constitutes a restraint on liberty such that a person would conclude that he is not free to leave varies with the particular police conduct at issue and the setting in which the conduct occurs." (*People v. Ross* (1990) 217 Cal.App.3d 879, 884, quoting *Michigan v. Chesternut, supra,* 486 U.S. at p. 573.)

In contrast, a detention requires "articulable suspicion that the person has committed or is about to commit a crime." (*Manuel G., supra,* 16 Cal.4th at p. 821.)  A detention occurs when the police, by physical force or show of authority, have in some way restrained a person's liberty. (*Bostick, supra,* 501 U.S. at p. 434.)  "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. [Citations.]" (*United States v. Mendenhall* (1980) 446 U.S. 544, 554; *People v. Terrell* (1999) 69 Cal.App.4th 1246, 1254.)  Other factors include the time and place of the encounter, whether the defendant was informed he was free to leave, whether the police indicated the defendant was suspected of a crime, whether the police retained the defendant's documents, and whether the police exhibited other threatening behavior. (See, e.g., *Wilson, supra,* 34 Cal.3d at p. 790; *People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1227.)

Coleman contends he was detained because the officers "ask[ed] him a series of intrusive questions" about "whether he was on probation or parole and had anything illegal on his person."  According to Coleman, a reasonable person in this situation would not feel free to leave.  We disagree and conclude Coleman was not detained.  The officers rode their bicycles up to Coleman in a public place and stopped several feet away from him.  They did not command him to stop.  The officers did not block his path or display

11

any weapons. They did not touch him. As Officer Stonebreaker explained, Coleman "stopped to talk to us to see what" the bicycle patrol program "was. That's all." (*United States v. Drayton* (2002) 536 U.S. 194, 197-200 [no detention where an officer wearing a concealed weapon boarded a bus, showed his badge to the defendant, questioned him, arrested his companion, and then asked the defendant to consent to a patdown search].)

Coleman's reliance on *Wilson, supra,* 34 Cal.3d 777, does not alter our conclusion. In *Wilson*, an undercover narcotics officer — who had been monitoring incoming flights at an airport to discover transportation of drugs — saw the defendant and another man arrive at the airport on a flight from Miami. The officer followed the defendant and the other man through the terminal, and then approached the defendant as he stood next to his car parked at the curb. (*Id.* at pp. 780-781.) The officer asked the defendant if he "'might have a minute of his time'" and, when the defendant agreed, the officer told the defendant he was conducting a narcotics investigation, and "'*had received information that he would be arriving today from Florida carrying a lot of drugs*.'" (*Id.* at p. 781, fn. omitted.) The California Supreme Court concluded the defendant was detained when the officer accused him of transporting narcotics because a reasonable person, when confronted by a narcotics officer and accused of importing illegal drugs, would not feel free to leave. (*Id.* at pp. 790-791.) *Wilson* is distinguishable. Here, Officer Stonebreaker did not accuse Coleman of committing a crime. He simply asked Coleman general questions about his name and date of birth. That Officer Stonebreaker asked Coleman whether he was on probation or parole and whether he possessed anything "illegal" does not make this situation similar to the one in *Wilson*, where the police officer followed the defendant and told him he was under suspicion of transporting narcotics.

Nor did the fact that the officers performed a warrant check transform the encounter into a detention. (*People v. Bouser* (1994) 26 Cal.App.4th 1280, 1282 (*Bouser*).) *Bouser* is on point. In that case, a police officer in a patrol car saw the defendant near a dumpster in an alley known for drug dealing. Nervous, the defendant began walking in the opposite direction. (*Id.* at p. 1282.) The officer parked his vehicle,

walked up to the defendant, and asked to speak with him. The defendant stopped and allowed the officer to speak with him. The officer asked the defendant general information questions, such as his name, date of birth, and prior arrest history. The officer then used this information to fill out a "field interview card" and radioed to check for outstanding warrants. (*Ibid.*) He did not tell the defendant he was checking for warrants, but the defendant heard the officer on his radio. The records check revealed an outstanding traffic warrant, which was relayed to the officer 10 minutes after his initial contact with the defendant. (*Id.* at p. 1283.) The officer arrested the defendant and found heroin in his pants pocket. (*Id.* at p. 1286.)

The *Bouser* court rejected the argument "that a warrant check automatically transforms an otherwise consensual police contact into a seizure." (*Bouser, supra,* 26 Cal.App.4th at p. 1287.) Evaluating the warrant check as "a single circumstance that must be viewed in light of the other facts presented[,]" *Bouser* concluded the encounter was consensual. In doing so, the court acknowledged the defendant may have suspected "he was somehow being investigated" and "reasonably may have felt the subject of general suspicion . . . . " (*Ibid.*) Nevertheless, the court observed "neither the questioning nor the warrant check related to specific and identifiable criminal activity. Moreover, [the officer] did not order [the defendant] to do anything or turn over anything to him to hold while the brief check was completed. Nor did [the officer] draw his weapon, make any threatening gestures, or utilize his car's lights or siren." (*Ibid.*)

The same is true here. As in *Bouser*, the warrant check did not convert the encounter into a detention. Here, Officer Stonebreaker asked questions about Coleman's identity and criminal background while Officer Evans performed a warrant check that took three minutes. Officer Stonebreaker's questions did not "relate[ ] to specific and identifiable criminal activity" and neither officer drew a weapon, made a threatening gesture, or commanded Coleman to do anything. (*Bouser, supra*, 26 Cal.App.4th at p. 1287.) We conclude the trial court properly denied Coleman's renewed motion to suppress.

13

*The Court Did Not Err by Declining to Compel the Prosecution to Run Officer Stonebreaker's Rap Sheet*

Coleman contends he "had a right to discovery of Officer Stonebreaker's criminal history, if any" under *Brady, Pitchess,* and section 1054.1 and suggests the court should have ordered the prosecution to run Officer Stonebreaker's rap sheet.[3]  To place the issues in context, we briefly describe "'criminal offender record information,'" which consists of "records and data compiled by criminal justice agencies for purposes of identifying criminal offenders and of maintaining as to each such offender a summary of arrests, pretrial proceedings, the nature and disposition of criminal charges, sentencing, incarceration, rehabilitation, and release."  (§ 13102.)  "Criminal offender record information" is commonly known as a "rap sheet" or a "CLETS rap sheet."  (See Cal. Code Regs., tit. 11, § 701; *In re M.L.* (2012) 205 Cal.App.4th 210, 217, fn. 4; *CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 658-659.)[4]

---

[3]      For a discussion of the interplay between *Brady* and *Pitchess*, and a comprehensive overview of the prosecution's disclosure obligations under *Brady* and *Pitchess*, see *People v. Superior Court* (*San Francisco*) (2014) 228 Cal.App.4th 1046 (*Johnson*), petition for review pending, petition filed September 18, 2014, S221296.

[4]      "In 1973, the Legislature, . . . enacted legislation designed to make 'the recording, reporting, storage, analysis, and dissemination of criminal offender record information . . . more uniform and efficient, and better controlled and coordinated.'  (Pen. Code, § 13100, subd. (e).)"  (*Westbrook v. County of Los Angeles* (1994) 27 Cal.App.4th 157, 161 (*Westbrook*).)  "The statutory scheme applies to criminal justice agencies at all levels of state government which perform, as their principal function, activities which relate to 'the apprehension, prosecution, adjudication, incarceration, or correction of criminal offenders' or 'the collection, storage, dissemination or usage of criminal offender record information.'  (Pen. Code, § 13101.)  Agencies falling within this definition are required to record 'criminal offender record information' in a form authorized by statute (Pen. Code, § 13125), and trial courts are required to report to the state Department of Justice (Pen. Code, §§ 13150, 13151) the outcome of most criminal cases.  (Pen. Code, §§ 13150, 13151.)"  (*Westbrook,* at pp. 161-162, fns. omitted.)

        The Department of Justice "maintains a central database containing master identification and criminal history records, including such information as the 'name, date of birth, physical description, fingerprints, photographs, date of arrests, arresting

The parties are correct that rap sheets themselves are not discoverable. (*People v. Roberts* (1992) 2 Cal.4th 271, 308 (*Roberts*); *People v. Santos* (1994) 30 Cal.App.4th 169, 175.) "However, "much, if not all of the information contained in the rap sheets is discoverable. [Citations.]" (Cal. Criminal Law: Procedure and Practice, *supra*, § 11.8, p. 250.) The California Supreme Court has held that the prosecution is under a *Brady* obligation to reveal the existence of felony convictions of prosecution witnesses. (*Roberts, supra,* 2 Cal.4th at p. 308; *In re Ferguson* (1971) 5 Cal.3d 525, 533.) Such exculpatory and impeachment evidence also includes information relating to charges pending against prosecution witnesses (*People v. Martinez* (2002) 103 Cal.App.4th 1071, 1080; *People v. Coyer* (1983) 142 Cal.App.3d 839, 842) and prosecution witnesses' probationary status. (*Millaud v. Superior Court* (1986) 182 Cal.App.3d 471, 476-477; Pipes & Gagen, California Criminal Discovery (4th ed. 2008) § 1:35.1, p. 111.)

### A. The Court Did Not Err By Declining to Compel the Prosecution to Run Officer Stonebreaker's Rap Sheet Pursuant to *Brady*

Coleman contends the court's refusal to order the disclosure of Officer Stonebreaker's criminal history information, if any, requires reversal pursuant to *Brady*. According to Coleman, the court erred by "carv[ing] out an exception" for Officer Stonebreaker and declining to order the prosecution to run his rap sheet. We disagree. As we explain below, we conclude the prosecution has a duty pursuant to *Brady* to learn

---

agencies, and booking numbers, charges, dispositions, and similar data. (Pen. Code, § 11105(a).)' . . . In addition, many local law enforcement agencies maintain criminal history databases." (Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2014) § 12.5, pp. 286-287; see also § 13300.) "[S]ection 13300 sets forth significant restrictions on access to '"[l]ocal summary criminal history information"' . . . . Certain persons, agencies and entities are entitled to receive the information if it is 'needed in the course of their duties.' [Citation.]" (*Westbrook, supra,* 27 Cal.App.4th at p. 162, fn. omitted; see also § 11105, subd. (b) & Cal. Code Regs. tit. 11, § 703(b) ["Criminal offender record information may be released, on a need-to-know basis, only to persons or agencies authorized by court order, statute, or decisional law to receive criminal offender record information"].) As of 1997, it was "the policy of the Department of Justice to release rap sheets only to prosecutors . . . and defense disclosure requests must go through the prosecutor's office." (*People v. Little* (1997) 59 Cal.App.4th 426, 432, fn. omitted (*Little*).

of and disclose material impeachment information about police officer witnesses within the prosecution's constructive possession, but the prosecution cannot be forced to comply with its *Brady* duty to investigate in a particular manner.

The prosecution's duty under *Brady* is well-established and we need not recite it here. (See *People v. Salazar* (2005) 35 Cal.4th 1031, 1042-1043; *In re Steele* (2004) 32 Cal.4th 682, 697.) As stated above, information found on a rap sheet about a witnesses' criminal history may meet *Brady*'s standard of materiality depending on the circumstances in a particular case. (See *infra*, at p. 15.) The People do not argue otherwise. They concede the prosecution had an obligation to disclose material favorable evidence under *Brady* and that — under *Little* — Coleman had "the right to information relating to [Officer Stonebreaker's] convictions of any felon[ies] or misdemeanors involving moral turpitude" if the information was "in the possession of the prosecuting attorney or the investigating agencies" or "'reasonably accessible' to the prosecutor."

Even when material information is within the constructive possession of the prosecution, *Brady* does not empower a defendant to compel the precise manner by which prosecutors learn whether such information exists. As we recently explained in *Johnson*, "*Brady* imposes the disclosure obligation on the prosecution, but it allows some flexibility in how the prosecution complies with that obligation." (*Johnson, supra,* 228 Cal.App.4th at p. 1080.) To be sure, prosecutors need some mechanism for ensuring they learn of *Brady* material within their constructive possession. (See *Giglio v. United States* (1972) 405 U.S. 150, 154.) But the choice of that mechanism is within district attorneys' broad "discretionary powers in the initiation and conduct of criminal proceedings," which "extend from the investigation and gathering of evidence relating to criminal offenses [citation], through the crucial decisions of whom to charge and what charges to bring, to the numerous choices the prosecutor makes at trial regarding 'whether to seek, oppose, accept, or challenge judicial actions and rulings.'" (*People v. Eubanks* (1996) 14 Cal.4th 580, 589.) As such, that choice "generally is not subject to supervision by the judicial branch." (*People v. Birks* (1998) 19 Cal.4th 108, 134.)

16

Although we conclude a defendant cannot compel the prosecution to run rap sheets on police officer witnesses pursuant to *Brady*, we note "the prosecution bears the risk of reversal if the adopted procedures are inadequate and *Brady* material is not disclosed." (*Johnson, supra,* 228 Cal.App.4th at p. 1081.) In other words, prosecutors who investigate witnesses' criminal histories through mechanisms other than running rap sheets risk a future *Brady* challenge if favorable information is later uncovered that would have been revealed on a rap sheet. Prosecutors have the discretion to learn of evidence favorable to the defense through the methods they consider to be appropriate, but a *Brady* claim may lie if a defendant is prejudiced because a prosecutor failed to obtain favorable evidence that was readily available by running a rap sheet. And this will be true whether or not the prosecutor acted in good faith or actually knew about the evidence that was not disclosed. (*Kyles v. Whitley* (1995) 514 U.S. 419, 438; *People v. Williams* (2013) 58 Cal.4th 197, 256; see also *U.S. v. Price* (2009) 566 F.3d 900.) "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." (*United States v. Agurs* (1976) 427 U.S. 97, 110.)

We conclude the court did not err by requiring the prosecution to comply with *Brady* but declining to order the prosecution to run Officer Stonebreaker's rap sheet.

B. The Court Did Not Abuse Its Discretion by Denying Coleman's *Pitchess* Motion to the Extent it Sought Officer Stonebreaker's Rap Sheet and Birth Date

Coleman contends he was entitled to Officer Stonebreaker's criminal history, if any, pursuant to *Pitchess*. "A defendant has a limited right to discovery of a peace officer's confidential personnel records if those files contain information that is potentially relevant to the defense. [Citations.]" (*People v. Moreno* (2011) 192 Cal.App.4th 692, 700-701 (*Moreno*).) The mechanics of a *Pitchess* motion are well established. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1219-1220 (*Mooc*); §§ 832.7, 832.8, Evid. Code, §§ 1043-1047.) We review the court's ruling on Coleman's *Pitchess* motion for abuse of discretion. (*Moreno, supra,* 192 Cal.App.4th at p. 701.)

17

We need not determine whether a police officer's rap sheet constitutes a "personnel record" under sections 832.7 and 832.8, nor whether a criminal defendant may obtain a police officer's rap sheet pursuant to *Pitchess* when such a document is present in the personnel file (see *California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1024 [suggesting *Pitchess* governs a prosecutor's duty to disclose peace officers' acts of misconduct involving moral turpitude]; *Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 400 ["*Pitchess* motions may also be used to discover information to impeach an officer's credibility"]) because the City stated there was no rap sheet in Officer Stonebreaker's personnel file and because the City and the Police Department stated they did not believe Officer Stonebreaker had a criminal history. Coleman concedes "one of the requirements of *Pitchess* is that the information be in the possession of the law enforcement agency." As Coleman recognizes, "If the City did not have the officer's criminal record . . . the proper method of obtaining the information was a general discovery request under *Brady* and section 1054.1." Here, the court was within its discretion to deny Coleman's *Pitchess* motion for Officer Stonebreaker's criminal history where there was no rap sheet or criminal history information in Officer Stonebreaker's personnel file.[5]

*People v. Cruz* (2008) 44 Cal.4th 636 (*Cruz*) is instructive. There, the defendant claimed the court erred by denying his *Pitchess* motion for information in two of three

---

[5] As stated above, the court conducted an in camera hearing pursuant to *Pitchess* and reviewed Officer Stonebreaker's personnel file and a record of the Police Department's investigation of complaints and investigations for information relevant to Officer Stonebreaker's "credibility," particularly "for dishonesty in terms of falsifying information." At Coleman's request, we reviewed the sealed in camera hearing transcript. The custodian of records brought Officer Stonebreaker's personnel file and a record of Internal Affairs Complaints Investigations to the hearing. The court placed the custodian under oath, described the contents of the personnel file and the Internal Affairs Complaints Investigations, and reviewed them. We conclude the record is adequate to determine what documents the court reviewed. We also conclude the court followed the procedure outlined by the California Supreme Court for *Pitchess* motions and did not abuse its discretion by ordering the disclosure of one complainant. (*Mooc*, *supra,* 26 Cal.4th at p. 1229; *People v. Prince* (2007) 40 Cal.4th 1179, 1285-1286.)

18

police officers' personnel files. (*Id.* at p. 669.) The California Supreme Court disagreed. It concluded the trial court did not abuse its discretion by denying the motion as to the two police officers in part because the defendant could not "demonstrate prejudice on a finding of error, as county counsel's representations at the hearing on the motion below, and the trial court's statements upon completion of its review of [the third officer's] confidential personnel files, together make clear that no information of the nature being sought through the discovery motion was to be found in any of the three officers' personnel files. [Citation.]" (*Id.* at pp. 670-671.) Here as in *Cruz*, there was "no information of the nature being sought" in Officer Stonebreaker's personnel file and, as a result, Coleman cannot demonstrate prejudice from the denial of his *Pitchess* motion seeking Officer Stonebreaker's rap sheet.

Coleman also suggests the court erred by denying his *Pitchess* motion to the extent it sought Officer Stonebreaker's birth date. We are not persuaded. While a police officer's birth date may be discovered only by means of a *Pitchess* motion (*Garden Grove Police Department v. Superior Court* (2001) 89 Cal.App.4th 430, 433-435), the denial of Coleman's *Pitchess* motion for Officer Stonebreaker's birth date was not prejudicial because Coleman concedes he sought Officer Stonebreaker's date of birth to enable the prosecution to "run a criminal background check" on the officer. As discussed at length above, we have concluded the prosecution has no obligation to run a police officer's rap sheet.

C.      The Court Did Not Err By Declining to Compel the Prosecution to Run
        Officer Stonebreaker's Rap Sheet Pursuant to Section 1054.1

Coleman seems to argue the court should have ordered the prosecution to run Officer Stonebreaker's rap sheet pursuant to section 1054.1, which requires the prosecuting attorney to "disclose to the defendant or his . . . attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] . . . [¶] (d) The existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial. [¶] (e) Any exculpatory evidence." (See

19

*Jones v. Superior Court* (2004) 115 Cal.App.4th 48, 57-58; Cal. Criminal Law: Practice and Procedure, *supra,* § 11.7, at p. 249.) We disagree. Section 1054.1 does not compel the manner by which the prosecutor must inquire and disclose the existence of a material prosecution witness's felony convictions.

Coleman's reliance on *Little* does not alter our conclusion. *Little* held "an informal request for standard reciprocal discovery" pursuant to section 1054.1 "is sufficient to create a prosecution duty to disclose the felony convictions of all material prosecution witnesses if the record of conviction is 'reasonably accessible' to the prosecutor." (*Little, supra,* 59 Cal.App.4th at p. 428.) *Little* holds the prosecution must, "on a standard discovery request[,] inquire of 'the existence'" of felony convictions for certain witnesses and disclose them but it does not compel the means by which prosecutors "inquire" of the existence of such felony convictions. (*Id.* at p. 433.)

III.

*The Health and Safety Code Section 11372.7 Drug Program Fee Must Be Reversed*

Coleman contends the $570 drug program fee must be reversed because the court improperly delegated the determination of his ability to pay to the probation department.[6]

_____

**6** We ordered the parties to submit supplemental briefs on whether Coleman forfeited his challenge to the imposition of the drug program fee by failing to object when the trial court imposed the fee. (*People v. McCullough* (2013) 56 Cal.4th 589 (*McCullough*).) Having reviewed the supplemental briefing, we conclude Coleman did not forfeit his claim regarding the drug program fee because the order for the drug program fee was an unauthorized sentence presenting a pure question of law. (See *People v. Smith* (2001) 24 Cal.4th 849.)

The California Supreme Court is considering whether the forfeiture rule announced in *McCullough* applies to the failure to object to the imposition of attorney fees, probation supervision fees, presentence investigation fees, and criminal justice administration fees. (See *People v. Aguilar*, review granted Nov. 26, 2013, S213571 [attorney fees, probation supervision fee, and criminal justice administration fee]; *People v. Trujillo*, review granted Nov. 26, 2013, S213687 [presentence investigation fee and probation supervision fee]; *People v. Valenzuela*, review granted Jan. 15, 2014, S214485 [crime prevention fine]; *People v. Povio*, review granted Oct. 15, 2014, S213571 [probation supervision fee].)

Health and Safety Code section 11372.7, subdivision (a) requires defendants convicted of certain drug offenses to "pay a drug program fee in an amount not to exceed one hundred fifty dollars [$150] for each separate offense." (*People v. Corrales* (2013) 213 Cal.App.4th 696, 701 (*Corrales*).)  This drug program fee "is mandatory unless the defendant is unable to pay." (*People v. Clark* (1992) 7 Cal.App.4th 1041, 1050 (*Clark*).)  Pursuant to Health and Safety Code section 11372.7, subdivision (b), "[t]he court shall determine whether or not the person who is convicted of a violation of this chapter has the ability to pay a drug program fee.  If the court determines that the person has the ability to pay, the court may set the amount to be paid and order the person to pay that sum to the county in a manner that the court believes is reasonable and compatible with the person's financial ability.  In its determination of whether a person has the ability to pay, the court shall take into account the amount of any fine imposed upon that person and any amount that person has been ordered to pay in restitution.  If the court determines that the person does not have the ability to pay a drug program fee, the person shall not be required to pay a drug program fee." (Health & Saf. Code, § 11372.7, subd. (b).)  Although the trial "court shall determine whether or not the person who is convicted of a violation of this chapter has the ability to pay a drug program fee" pursuant to Health and Safety Code section 11372.7, subdivision (b), the court is not required to make an express finding of ability to pay the drug program fee. (See *People v. Martinez* (1998) 65 Cal.App.4th 1511, 1516; *People v. Staley* (1992) 10 Cal.App.4th 782, 785.)

Because the trial court is not required to make an express finding of ability to pay the drug program fee, some courts have presumed the trial court determined the defendant had the ability to pay the drug program fee when the record "does not suggest otherwise[.]" (*Clark*, *supra,* 7 Cal.App.4th at p. 1050; *Corrales, supra,* 213 Cal.App.4th at p. 702.)  Here, we cannot presume the court found Coleman had the ability to pay the drug program fee because the court explicitly stated the probation department would "do an analysis of [Coleman's] ability to pay, and it will be set that way."  By delegating the ability to pay finding to the probation department, the court failed to comply with Health and Safety Code section 11372.7, subdivision (b), which requires the court — not the

21

probation department — to "determine whether or not the person who is convicted of a violation of this chapter has the ability to pay a drug program fee." We cannot, as the People urge, presume "the trial court will comply with Health and Safety Code section 11372.[7]" at some point in the future. We conclude the court erred by delegating to the probation department the analysis of Coleman's ability to pay the drug program fee. On remand, the court must "conduct a hearing concerning [Coleman's] ability to pay the drug program fee in light of his total financial obligations. [Citations.]" (*Corrales, supra,* 213 Cal.App.4th at p. 702.)

IV.

*The Section 987.8 Attorney Fees Must Be Reversed*

Coleman's final contention is the court erred by ordering him to pay $500 in attorney fees pursuant to section 987.8 without considering his ability to pay. We address the merits of this claim because the People do not argue Coleman's failure to object at the sentencing hearing forfeits this issue on appeal.[7]

"In California, the statutory procedure for determining a criminal defendant's ability to reimburse the county for the services of court-appointed counsel is set forth in section 987.8."[8] (*People v. Phillips* (1994) 25 Cal.App.4th 62, 72, fn. omitted (*Phillips*).)

---

**7** As we have noted, the California Supreme Court is considering whether forfeiture principles apply to section 987.8 attorney fee awards. (See *People v. Aguilar*, review granted Dec. 12, 2013, S213571.) We need not discuss the cases applying (and declining to apply) forfeiture principles to section 987.8 awards because the People do not argue forfeiture.

**8** Section 987.8, subdivision (b) provides in relevant part: "In any case in which a defendant is provided legal assistance, . . . upon conclusion of the criminal proceedings in the trial court, . . . the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings. The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into the ability of the defendant to pay all or a portion of the legal assistance provided."

Section 987.8, subdivision (d) provides: "If the defendant, after having been ordered to appear before a county officer, has been given proper notice and fails to appear

Under section 987.8, subdivision (e), the determination that a defendant has the present ability to pay is a prerequisite to entry of an order requiring payment of attorney fees. The finding of ability to pay may be express or implied, as long as it is supported by substantial evidence. (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1537; *Phillips*, *supra*, 25 Cal.App.4th at p. 71.) "'Ability to pay' means the overall capability" of the defendant to reimburse all or a portion of the defense costs. (§ 987.8, subd. (g)(2).) Ability to pay requires consideration of the defendant's financial position at the time of the hearing, his "reasonably discernible" financial position over the subsequent six months, including the likelihood of employment during that time, and "[a]ny other factor or factors which may bear upon the defendant's financial capability to reimburse the county for the costs of the legal assistance provided to the defendant." (§ 987.8, subds. (g)(2)(B)-(D).)

Here, the court did not make an express finding of Coleman's ability to pay the attorney fees. Instead, it ordered Coleman to report to a county office for consideration of his ability to pay.[9] The court, however, did not order Coleman to pay $500 in attorney

before a county officer within 20 working days, the county officer shall recommend to the court that the full cost of the legal assistance shall be ordered to be paid by the defendant. The notice to the defendant shall contain all of the following: [¶] (1) A statement of the cost of the legal assistance provided to the defendant as determined by the court. [¶] (2) The defendant's procedural rights under this section. [¶] (3) The time limit within which the defendant's response is required. [¶] (4) A warning that if the defendant fails to appear before the designated officer, the officer will recommend that the court order the defendant to pay the full cost of the legal assistance provided to him or her."

Section 987.8, subdivision (e)(5) provides in relevant part: "If the court determines that the defendant has the present ability to pay all or a part of the cost, the court shall set the amount to be reimbursed and order the defendant to pay the sum to the county in the manner in which the court believes reasonable and compatible with the defendant's financial ability."

[9]     The court's written order concerning attorney fees is a preprinted form. It states: "[A] county officer will interview you to determine if you are able to pay all or part of the services of the attorney appointed by the Court to handle your case. If the Probation Collection Unit finds that you are able to pay a certain amount, and you do not agree, you have the right to a hearing in this Court to decide what amount, if any, you must pay. At

23

fees *only if* the Probation Collection Unit determined he was able to pay, nor did the court indicate the attorney fees order was conditioned upon such a finding. Because the court entered an unconditional attorney fees order, we must consider whether substantial evidence supports an implied finding Coleman has the ability to pay.

The answer is no. Substantial evidence does not support an implied finding that Coleman has the ability to pay. Although the probation report indicated Coleman had been employed in the past and had some employable skills, it also reported he was not employed at the time of the offense, had not worked in several years, had no assets, and suffered from numerous health problems. "The specific language of section 987.8 expressly requires a finding of *present ability* to pay for defense costs." (*People v. Nilsen* (1988) 199 Cal.App.3d 344, 350.) That Coleman may have been employed in the past does not constitute substantial evidence of his *present* ability to pay attorney fees. Because the court may not consider a period beyond six months after the hearing in determining a defendant's present ability to pay (§ 987.8, subd. (g)(2)(B)), Coleman's three-year jail term strongly suggests an inability to pay.

We conclude there was insufficient evidence before the trial court of Coleman's present ability to pay attorney fees.[10] The attorney fee order must be reversed. On

the hearing you will have the right to: (i) be heard in person, (ii) present witnesses and other documentary evidence, (iii) confront and cross-examine adverse witnesses, and (iv) have the evidence against you disclosed to you. You are also entitled to have a copy of any written recommendation of the county officer and a written statement of any findings of the court. [¶] If you do not go to the Probation Collection Unit, as ordered, you waive (give up) your right to a hearing, and the Court will enter a judgment against you, ordering you to pay for the services of your attorney." Coleman signed the order, indicating that he "acknowledge[d] receipt of the above order and under[stood] that if [he did] not report as ordered, the court [would] enter a judgment against [him] for the total costs of legal services of [his] attorney."

[10] We reject Coleman's suggestion that he was presumptively unable to pay attorney fees pursuant to section 987.8 subdivision (g)(2)(B). (*People v. Prescott* (2013) 213 Cal.App.4th 1473, 1476 (*Prescott*) [statutory presumption that prisoner cannot reimburse costs of defense did not apply to defendant sentenced to jail under the Realignment Act (§ 1170, subd. (h)(5)(B))].)

remand, the court must make a determination under section 987.8 of Coleman's ability to pay. (*Prescott, supra,* 213 Cal.App.4th at p. 1476 ["Since the trial court failed to consider [the defendant's] ability to pay as required by section 987.8, we remand the matter for a new hearing"]; *People v. Verduzco* (2012) 210 Cal.App.4th 1406, 1421 [no substantial evidence of ability to pay section 987.8 attorney fees where trial court did not conduct a hearing]; *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1081.)

DISPOSITION

The order imposing the Health and Safety Code section 11372.7 drug program fee and the Penal Code section 987.8 attorney fees is reversed. On remand, the court must determine Coleman's ability to pay these fees in light of his total financial situation. If Coleman has the ability to pay such fees, the order imposing the fees will be reinstated. In all other respects, the judgment is affirmed.

_____

Jones, P.J.

We concur:


_____

Simons, J.


_____

Needham, J.

Superior Court of Contra Costa County, No. 05-110237-5, Thomas M. Maddock, Judge.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Eric D. Share and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.